# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALITYBUILT.COM, INC., | CASE NO. 07cv627 WGH(AJB) |
| Plaintiff, | **ORDER** |
| vs. | (Doc. # 11) |
| COAST TO COAST ENGINEERING SERVICES, INC. d/b/a CRITERIUM ENGINEERS; and DOES 1 through 20, inclusive, | |
| Defendant. | |

The matter before the Court is the "Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue," issued by the Superior Court of the State of California, County of San Diego on April 5, 2007, and, after removal, modified by this Court on April 11, 2007. Plaintiff QualityBuilt.com, Inc. ("QualityBuilt") argues that the Court should extend the temporary restraining order ("TRO") or issue a preliminary injunction, while Defendant Coast to Coast Engineering Services, Inc., d/b/a Criterium Engineers ("Criterium") opposes the ordering of any injunctive relief.

## I.    Background

On April 3, 2007, QualityBuilt filed a Complaint and "Request for Ex Parte Application for a Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue" ("Application for TRO") against Criterium in state court. In the Complaint

and Application for TRO, QualityBuilt alleges that it provided Criterium with its proprietary information, including its customer list, in conjunction with a "Master Services and Licensing Agreement" (the "Contract"). (Compl. ¶¶ 15, 18-19; *see also* Luhr Decl. ¶ 14.) By the end of 2006, a dispute had arisen over approximately $1.9 million in payments Criterium claimed it was owed by QualityBuilt for engineering services performed on construction projects pursuant to the Contract. (Apr. 14, 2007 Tinsman Decl. ¶ 11.) QualityBuilt claims that Criterium has "submitted billings not accurately depicting the nature and extent of its services," and "[i]n order to determine the extent of Criterium's non-performance, QualityBuilt has undertaken an audit of all projects where Criterium provided services." (Apr. 3, 2007 Michaelis Decl. ¶ 10.) According to QualityBuilt, "[o]nce QualityBuilt has completed the audit, QualityBuilt will be in a position to determine what is actually owed between the parties."[1] (Apr. 3, 2007 Michaelis Decl. ¶ 12.)

In early 2007, Criterium sent letters to QualityBuilt clients stating that, as QualityBuilt's subcontractor, a portion of the client's outstanding invoices to QualityBuilt is due to Criterium. (Suppl. Mem. Supp. Extending TRO, Ex. G; Apr. 14, 2007 Tinsman Decl. ¶¶ 13-15, Ex. 2.) For example, one such letter states, in part:

> Unfortunately, to date, we have not received payment of these funds from [QualityBuilt]. As a subcontractor, there are certain legal protections provided to us in these types of instances where a contractor does not pay its subcontractor, one of which is to file mechanic liens and/or a civil complaint against the client.
> Because [Criterium] values the relationship we have had with you in the past and hope to maintain a positive relationship with you in the future, we are very eager to avoid any necessary legal entanglements, such as lien filings. We are therefore respectfully requesting that you pay the [Criterium] share of each [QualityBuilt] invoice directly to [Criterium] and then pay the balance of the invoice to [QualityBuilt] for their share. The attached schedule shows both the total amount of the [QualityBuilt] invoice and the [Criterium] share, which we ask to be paid to us.
> Upon clearing of funds, we will in turn provide you with a Release absolving you of any further obligation to [Criterium] and we will notify [QualityBuilt] of said payment to us.
> Given the strict timelines in pursuing mechanic lien claims, time is of the essence.

---

[1] In a letter dated March 30, 2007, QualityBuilt's counsel indicated that "QualityBuilt expects to be able to determine the amounts owed in the next few weeks." (Apr. 3, 2007 Michaelis Decl., Ex. 8.)

1  (Suppl. Mem. Supp. Extending TRO, Ex. G.) After sending these letters, "Criterium followed
2  up with a number of third parties by telephone and e-mail." (Apr. 14, 2007 Tinsman Decl. ¶
3  14.) According to Criterium, "[t]he sole purpose of these collection efforts was to reconcile
4  our accounts and ensure that Criterium received payment for services rendered." (Apr. 14,
5  2007 Tinsman Decl. ¶ 15.)

6        In its Complaint, QualityBuilt alleges that these collection letters are part of "a
7  campaign to contact QualityBuilt's clients to solicit business" and "disparage QualityBuilt's
8  reputation and integrity." (Compl. ¶ 23.) QualityBuilt brings claims for misappropriation of
9  trade secrets and unfair competition, seeking economic damages, punitive damages and
10 injunctive relief. (Compl. ¶¶ 17-35.)

11       On April 5, 2007, the state court issued the "Temporary Restraining Order and Order
12 to Show Cause Why a Preliminary Injunction Should Not Issue" ("TRO"). The TRO provides:

13
> Based upon the Complaint, the Memorandum in Support of the ex parte application for a Temporary Restraining Order and an Order to Show Cause why a preliminary injunction should not issue, and the declarations filed in this matter, and good cause appearing therefore,
>
> Defendants are hereby ordered to show cause at 9:00 a.m. on April 16, 2007 . . . why you, your agents, servants, assigns and all those acting in concert with you, should not be further restrained and enjoined pending further order in this action from disclosing or otherwise utilizing QualityBuilt.com's . . . proprietary, trade secret, and confidential information.
>
> Pending the . . . hearing . . ., Coast to Coast Engineering Services, Inc., d/b/a Criterium Engineers . . . and its agents, servants, assigns and all those acting in concert with it are restrained and enjoined from contacting the clients on list attached hereto under seal for the purpose of collecting money and are further restrained from contacting clients on the above referenced list that are "keyed" as "A" or "D" as described in the attached letter from attorney Timothy J. Bryant.
>   . . . .
> The restraining order granted herein shall expire on 4-16, 2007, unless extended by stipulation or order of the Court. No bond is required for the issuance of the Temporary Restraining Order.

(Notice of Removal, Ex. A.) The list attached to the TRO contains a list of approximately 2,200 names, approximately 160 of which are "keyed" as "A" or "D". Category "A" is comprised of "Clients that [Criterium Engineers] worked with during the term of the [Contract]," and category "D" is comprised of "Clients that [Criterium] has contacted regarding the collection of monies owed to [Criterium]." (Notice of Removal, Ex. A.)

      On April 6, 2007, Criterium removed the action to this Court, alleging diversity

jurisdiction.[2]  Also on April 6, 2007, QualityBuilt filed for arbitration with the American Arbitration Association, claiming that the dollar amount of QualityBuilt's claim against Criterium is between $1,000,000 and $5,000,000.[3]  (Fleming Decl. ¶ 2, Ex. I.)

On April 9, 2007, Criterium filed an Application for Modification of the TRO, moving the Court for an order modifying the TRO to allow Criterium to continue performing work for non-party Kitchell Contractors ("Kitchell"), who is also a client of QualityBuilt.  According to Criterium:

> Currently Criterium Engineers has twelve commercial projects underway with Kitchell Contractors in Arizona. . . .  Each of these is a commercial construction (as opposed to residential) project. . . .  Criterium Engineers was not doing work on any of these commercial projects pursuant to the Contract with QualityBuilt; rather Criterium Engineers was only doing residential inspections for a few Kitchell projects pursuant to the Contract with QualityBuilt.

(Application for Modification at 7 (citing Apr. 6, 2007 Tinsman Decl. ¶ 17).)[4]  Criterium further asserted:

> The effect of the TRO has meant that the engineering and field technician staff performing the consulting services and inspections for Kitchell Contractors have had to walk off of on-going projects without explanation.  Since Criterium Engineers is under contract to perform these services, the Professional Engineering licenses of its CEO, Alan Mooney, and other engineering principals in the company are at risk for violating state law as it relates to the performing of engineering services since Criterium Engineers is being restrained from fulfilling its contractual obligations to Kitchell Contractors.

(Application for Modification at 8 (citing Apr. 6, 2007 Tinsman Decl. ¶¶ 1, 20-21).)

---

[2] Diversity jurisdiction was properly alleged, and has not been disputed.

[3] The Contract contains an arbitration clause which provides:
The parties agree that the venue for any dispute arising between the Parties regarding this Agreement or work performed under this Agreement shall be binding arbitration conducted by the American Arbitration Association (AAA) in San Diego, California. . . .  The sole exception to this is that QB may apply to a court of competent jurisdiction for injunctive relief and damages in the event Criterium . . . misappropriate[s] trade secrets or infringe[s] upon other intellectual property of QB.
(Suppl. Mem. Supp. TRO, Ex. B § 13.2.)

[4] According to Criterium's Director, "[w]hile providing residential services for a Kitchell Contractors' project, Criterium Engineers was asked if it could provide engineering services for some Kitchell commercial projects. . . .  Criterium Engineers is not using any of the methods, software or hardware of QualityBuilt in performing the work for Kitchell Contractors. . . .  The QualityBuilt system does not apply to these projects." (Apr. 6, 2007 Tinsman Decl. ¶¶ 14, 16.)

On April 11, 2007, the Court modified the TRO to allow Criterium to work for Kitchell. The Court stated:

> QualityBuilt has failed to show, or even to argue, that QualityBuilt would suffer irreparable injury if the TRO was modified to allow Criterium to continue providing services to Kitchell Contractors. Even if QualityBuilt is correct that Criterium's work for Kitchell constitutes a breach of the Contract, QualityBuilt has not shown that its injury could not be remedied by a damage award. Conversely, Criterium has shown that Kitchell and Kitchell's subcontractors--nonparties to this action--would be harmed by continuing to enjoin Criterium from providing services to Kitchell. Therefore, the TRO will be modified to allow Criterium to provide services to Kitchell.

(Apr. 11, 2007 Order at 5.) In the same Order, the Court scheduled the show cause hearing on whether a preliminary injunction should issue for April 17, 2007; the Court also extended the TRO to the date of the show cause hearing. After receiving additional briefing and evidence from the parties, the Court conducted the hearing on April 17, 2007.

**II.   Discussion**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation omitted). The Ninth Circuit has described two sets of criteria for preliminary injunctive relief. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005).

"Under the 'traditional' criteria, a plaintiff must show '(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases).' . . . Alternatively, a court may grant the injunction if the plaintiff 'demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor.'" *Id.* (quoting *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995)). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum." *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir. 1998) (internal quotation marks and citations

omitted).

"Under any formulation of the test, the moving party must demonstrate a significant threat of irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987) (citation omitted). If the moving party fails to meet this "minimum showing," the Court "need not decide whether [the movant] is likely to succeed on the merits." *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

QualityBuilt argues that Criterium's collection efforts (comprising the above-quoted letters, and "follow up" e-mails and phone calls) threaten to irreparably harm QualityBuilt. In its brief, QualityBuilt argues:

> QualityBuilt has advised Criterium of the evidence gathered of Criterium's incomplete and substandard inspections. Despite this evidence, Criterium has represented, and continues to tell QualityBuilt and QualityBuilt's clients and specifically its contacts that it has wrongfully been refused payment from QualityBuilt. Criterium sent, prior to the TRO, letters or e-mails to many of QualityBuilt's major clients soliciting business, and seeking direct payment of moneys it claims it is owed, implying that QualityBuilt was not honoring its contractual and financial obligations to Criterium. Criterium also threatened to file mechanics liens.
> Further shaking the confidence of clients in QualityBuilt's reliability is the fact that some of the invoices Criterium is submitting to QualityBuilt's clients include charges for amounts QualityBuilt has already paid Criterium, or erroneous charges unrelated to the project associated with the invoice.

(Suppl. Mem. Supp. Extending TRO at 7 (citing Apr. 3, 2007 Michaelis Decl. ¶ 18; Jaggard Decl. ¶ 3; Murphy Decl. ¶ 2).) QualityBuilt further argues:

> Criterium's contact with QualityBuilt's clients irreparably harms QualityBuilt in three significant ways: 1) it shakes client confidence in QualityBuilt's performance, integrity and responsibility, qualities critical in this industry and the bedrock of QualityBuilt's client relationships; 2) damages QualityBuilt's goodwill within the industry; and 3) it allows Criterium to unfairly profit from one of QualityBuilt's most valuable and protected assets, its client list and contacts while diminishing QualityBuilt's ability to protect those relationships in the future.

(Suppl. Mem. Supp. Extending TRO at 1.)

In support of its argument, QualityBuilt submits a Declaration from QualityBuilt's President stating: "It is my belief that if Criterium is not prevented from continuing its course of conduct, and is permitted to contact and harass QualityBuilt's clients, QualityBuilt will suffer irreparable harm in the form of damaged client relationships and diminished credibility in the industry, which cannot be compensated for with monetary damages." (Apr. 3, 2007

Michaelis Decl. ¶ 22.) QualityBuilt submits an e-mail sent March 29, 2007 to QualityBuilt's President from a client, which states:

> Hello Beth, Hope all is well and you enjoy your time off. I received this letter from Criterium Engineering and I am very concerned to say the least. Criterium is asking me for a response to their demand letter and the last thing I need is a lien to deal with on something I should not be involved in. I need to hear back from someone at QB as soon as possible so I can avoid the lien frustration.

(Apr. 3, 2007 Michaelis Decl. ¶ 17, Ex. 3; *see also* Apr. 3, 2007 Michaelis Decl., Ex. G ¶ 3.) QualityBuilt also submits a letter from another client dated March 28, 2007 which states:

> [Client] is in receipt of a notice of nonpayment letter from Criterium Engineers dated March 26, 2007. The notice of nonpayment letter is due to an outstanding balance owed to Criterium for work directly related to this project. Pursuant to your subcontract, you are hereby on notice to defend, indemnify, and hold [client] harmless from claims and actions related to this issue. Additionally, you are to remedy this claim expeditiously. In the event that said claim has not been remedied within ten (10) days, [client] reserves the right to pay the obligation. In the event that [client] should remedy the outstanding payment, a deductive change order for the amount paid will be issued to adjust QualityBuilt's contract amount accordingly.

(Suppl. Mem. Supp. Extend TRO, Ex. H.)

While "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award," *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), the Ninth Circuit has "recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Id.* (citing *Regents of Univ. of Cal. v. Am. Broad. Co.*, 747 F.2d 511, 519-20 (9th Cir. 1984)). Business goodwill includes a company's reputation. *See WMX Techs. v. Miller*, 80 F.3d 1315, 1325 (9th Cir. 1996). However, the moving party must submit evidence sufficient to demonstrate a "significant threat" of an intangible injury. *Arcamuzi*, 819 F.2d at 937. In *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374 (9th Cir. 1985), a newspaper alleged that a competitor's use of exclusivity contracts caused it to suffer "the loss of reputation, competitiveness, and goodwill." *Id.* at 1377. The Ninth Circuit affirmed the district court's denial of a preliminary injunction on the grounds that plaintiff

failed to show irreparable injury.[5] The court stated:

> Assuming that in some cases lost reputation is irreparable, we must determine whether the trial court's finding is clearly erroneous that no irreparable loss was caused by the exclusivity provisions. Plaintiff has not shown that the decline in its sales is caused by the exclusive feature contracts. In its brief to this court, plaintiff pointed to only two affidavits to demonstrate injury. In the first, Robert Maynard, the principal shareholder of plaintiff's parent corporation, stated that defendants' use of exclusivity provisions caused plaintiff's market share to decrease. In the second, journalism professor Norman Isaacs, previously the editor of an Indiana newspaper, attested that as a general matter, when a newspaper is deprived of popular features, it is placed at a competitive disadvantage; Isaacs also attested that some features under contract to defendants are quite popular. . . . Professor Isaacs did not address the particular situation in issue, and Mr. Maynard provided only conclusory statements and was an interested party.

*Id.* at 1377 (citations omitted).

Similarly, QualityBuilt has supplied only conclusory statements of an interested party (QualityBuilt's President) and a few communications from QualityBuilt clients indicating they were upset about the possibility of mechanic's liens being filed against their property. The evidence, however, does not show that any client was threatening to terminate its relationship with QualityBuilt or that Criterium's collection efforts would otherwise have any significant or lasting impact on the relationship between the client and QualityBuilt. This evidence is insufficient to establish irreparable injury. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("Four advertisers say that they prefer dealing with one company, find it costly and inefficient to deal with college newspapers directly, and that the exclusives will affect their decision to continue to do business with [plaintiff] AP. These affidavits are from current clients of AP. None of the advertisers says that it will discontinue business with AP as a result of the contracts. Even if the evidence showed that four advertisers were unwilling to do business with AP because [defendant] Cass had exclusives with desirable schools, this would be insufficient evidence of irreparable harm.").

Moreover, even if QualityBuilt's evidence was sufficient to show that Criterium's collection letters, e-mails and phone calls presented a significant threat of irreparable injury

---

[5] Because the plaintiff in *Oakland Tribune* failed to show irreparable injury, the Ninth Circuit did not consider plaintiff's likelihood of success on the merits. *See Oakland Tribune*, 762 F.2d at 1378.

to QualityBuilt's reputation and goodwill in the industry, such evidence would not be sufficient to warrant injunctive relief in this case. QualityBuilt concedes that this Court cannot issue an injunction enjoining Criterium from filing mechanic's liens pursuant to state law. (Apr. 17, 2007 Hearing Trans. at 5, 46.) Whatever irreparable damage to QualityBuilt's reputation and goodwill that might be caused by Criterium's collection letters, e-mails and phone calls, would similarly be caused if Criterium instead filed mechanic's liens. If QualityBuilt's clients were to infer (rightfully or wrongfully) from Criterium's direct communications that QualityBuilt has not met its payment obligations, the same inference likely would be drawn from Criterium's filing of mechanic's liens on the property. Therefore, QualityBuilt has failed to show that the primary harms allegedly inflicted by Criterium's collection letters, e-mails and phone calls likely would be prevented by the requested injunctive relief. "A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and *preventing the irreparable loss of rights before judgment.*" *Textile Unlimited, Inc. v. A. BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001) (emphasis added) (citing *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)). Where the movant fails to show that the preliminary injunction would prevent the alleged injury, the injunction should not be issued.

There is one injury allegedly caused by Criterium's collection letters which would not similarly be caused by the filing of mechanic's liens. Criterium's collection letters state in part:

> Because [Criterium] values the relationship we have had with you in the past and *hope to maintain a positive relationship with you in the future*, we are very eager to avoid any necessary legal entanglements, such as lien filings. We are therefore respectfully requesting that you pay the [Criterium] share of each [QualityBuilt] invoice directly to [Criterium] and then pay the balance of the invoice to [QualityBuilt] for their share.

(Suppl. Mem. Supp. Extending TRO, Ex. G (emphasis added).) QualityBuilt argues that the italicized language "is a transparent attempt to solicit business." (Suppl. Mem. Supp. Extending TRO at 9.) However, QualityBuilt has failed to support its argument with evidence that any recipient of the letters construed them as solicitations, or that the alleged solicitations caused QualityBuilt injury. QualityBuilt has presented no evidence that it has lost any client

1 to Criterium due to these letters or Criterium's other collection efforts.[6] Conversely, Criterium has presented the following affidavit testimony from its Director:

> After mailing the collection letters, Criterium followed up with a number of the third parties by telephone and e-mail. Criterium prepared talking points to ensure that QualityBuilt was not disparaged during these follow-up conversations. . . . Paramount in advice and my own calls were the issues to avoid: 1) Do not solicit business; 2) Do not criticize [QualityBuilt]; 3) Do not offer details of our problems. . . . A few customers that Criterium was serving in connection with QualityBuilt requested that Criterium continue to perform inspection services to the exclusion of QualityBuilt. Criterium declined those requests in every instance. Criterium was careful to avoid any potential interference with [QualityBuilt] customers, even though Criterium believes the [Contract] does not prohibit them from accepting or seeking that work. . . . At the time of the termination of the [Contract], Criterium Engineers was the sole provider of inspection services for nearly 600 different projects, in 25 states, arising from the [Contract]. Today, none of these projects are being served in any manner . . . by Criterium.

(Apr. 14, 2007 Tinsman Decl. ¶¶ 14, 16-17.) In sum, QualityBuilt has failed to produce sufficient evidence to support its argument that Criterium is soliciting QualityBuilt's clients; and thus this argument cannot support QualityBuilt's claim of irreparable injury. *See Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) ("Big Country argues . . . that the irreparable injury it will suffer if injunctive relief is not granted is the 'loss of a contract.' This loss is irreparable, Big Country asserts, because even if it is successful on the merits, Alaskan law provides no monetary damages for this kind of challenge. . . . [W]e assume . . . that Big Country is referring to pecuniary injury--lost profits. If so, we need not decide if Big Country has an adequate remedy at law for this injury. The record is barren of evidence of lost profits.") (affirming the denial of a preliminary injunction solely on the basis that plaintiff failed to show an irreparable injury).

---

[6] Even if QualityBuilt had shown that it lost clients due to Criterium's alleged solicitations, this likely would be insufficient to show irreparable injury. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("Without a sufficient showing that these contracts threatened AP's existence, any loss in revenue . . . is compensable in damages."); *DiMare Fresh, Inc. v. Sun Pac. Mktg. Coop.*, 2006 U.S. Dist. LEXIS 70795, at *7 (E.D. Cal., Sept. 19, 2006) ("Although a loss of customers and a resulting loss in revenue surely make it more difficult to compete, they do not amount to irreparable harm because such injuries are measurable and thus have an adequate remedy at law.") (quoting *Bell Atl. Bus. Sys. v. Storage Tech. Corp.*, 1994 U.S. Dist. LEXIS 4471, at *9 (N.D. Cal., Apr. 5, 1994)); *Dreyer's Grand Ice Cream, Inc. v. Ben & Jerry's Homemade, Inc.*, 1998 U.S. Dist. LEXIS 23465, at *8 (N.D. Cal., Nov. 30, 1998) ("[L]ost customers generally do not amount to an irreparable harm without some threat to the existence of the enterprise.") (citing *Am. Passage Media Corp.*, 750 F.2d at 1473).

1   Because QualityBuilt has failed to meet its burden of demonstrating a significant threat
2 of irreparable injury, the Court "need not decide whether [plaintiff] is likely to succeed on the
3 merits." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985)
4 ("Under any formulation of the test, plaintiff must demonstrate that there exists a significant
5 threat of irreparable injury. Because the Tribune has not made that minimum showing we need
6 not decide whether it is likely to succeed on the merits.") (citations omitted); *see also Big
7 Country Foods*, 868 F.2d at 1088 (same); *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d
8 935, 937 (9th Cir. 1987) (same).

### III.   Conclusion

For the reasons discussed above, the Court finds that QualityBuilt has failed to meet its burden of showing that preliminary injunctive relief is warranted. Therefore, the "Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue" is hereby dissolved. (Doc. # 11.)

DATED:  April 18, 2007

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge